# UNITED STATES DISTRICT COURT DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| | : | |
| V. | : | CRIM. NO. 3:22-cr-00088-JBA |
| | : | |
| LEAH BOUCHER | : | JULY 26, 2022 |

## DEFENDANT'S MEMORANDUM IN AID OF SENTENCING

The defendant, **LEAH BOUCHER**, by and through her attorney, submits this memorandum to aid the Court in selecting a sentence pursuant to 18 U.S.C. §3553(a) that is "sufficient, but not greater than necessary" to achieve the goals of sentencing.

Ms. Boucher stands convicted of one count of giving a False Statement During the Purchase of a Firearm in violation of 18 U.S.C. §§ 922(a)(6) and 924(a)(2). She faces an advisory Guideline range of 12-18 months of imprisonment. See Pre-Sentence Report (PSR) ¶ 3. Sentencing is scheduled for August 10, 2022, at 11:00 a.m.

## PRELIMINARY STATEMENT

Ms. Boucher is a 30-year-old, single woman. She comes before the Court for sentencing following her first-ever criminal conviction. To be sure, the offense is a serious one. Ms. Boucher provided three separate false statements during the purchase or attempt to purchase three firearms, in violation of 18 U.S.C. §§ 922(a)(6) and 924(a)(2).

1

Her involvement in the conduct for which she stands before the Court is out of character for her as noted in the three character reference letters submitted with the PSR, and also by her lack of any prior criminal history. It is also noted, in the PSR, Part C, "Offender Characteristics". Ms. Boucher led a normal, family life and was raised by her parents, Terry Boucher, and Linda (née Woosley) Boucher. She herself describes her childhood as a pleasant one, spending a lot of time with her maternal grandparents during the summers, who lived behind her home. It was a close-knit family which she enjoyed being a part of. Unfortunately, in October of 2017, her mother, Linda, at the age of 63, suffered two serious strokes which resulted from a brain tumor. To this day she is unable to write, walk and she has a hard time speaking and suffers from memory loss. In short, she is unable to care for herself and requires daily assistance. Prior to Ms. Boucher's detention in this matter, she spent a significant amount of time assisting her parents on a daily basis and frequently spent a great deal of time in Maine where her parents reside, in order to take care of her mother. Her mother's sudden severe illness and subsequent incapacitation had a severe impact upon Ms. Boucher and has played a significant role in her life.

Ms. Boucher was also married on one prior occasion from September 2019 to June 2021 to Matthew Neault despite having dated for approximately ten years prior to their marriage. It was Ms. Boucher who decided to terminate the marriage as she attributes her substance addiction as having developed during the marriage from her husband's introduction of substances to her. Following their divorce, she sought treatment and remained substance free, but attributes her return to illicit substances and relapse during pre-trial supervision, to her renewed association with her former husband, Mr. Neault.

Following Ms. Boucher's arrest on October 15, 2021, by Federal authorities, she was released the same day on a $100,000.00 unsecured surety bond. However, due to lack of

2

compliance with the Court's conditions of release, she was ultimately remanded into custody at the Donald D. Wyatt Detention Facility in Central Falls, Rhode Island on February 23, 2022, and has remained there ever since. As of the date of sentencing, she will have been in custody for a period of 5 months and 18 days.

There is no question that Ms. Boucher's failure to abide by the Court's orders imposed on her on October 15, 2021, would appear to be troubling to the Court. However, since her detention she has remained disciplinary free of any tickets, but more importantly, she has taken it upon herself to engage in substance abuse and other programs while detained. During this time, she has also had the opportunity to seriously reflect upon her pre-detention conduct and has fully accepted responsibility for her actions as noted in the PSR ¶ 46, which indicates that "The defendant has <u>clearly</u> demonstrated acceptance of responsibility for the offense." (Emphasis added.)

Ms. Boucher's recent criminal behavior stands in stark contrast to the rest of her life prior to her mother's incapacitation. Before meeting the individuals, Mr. Alexander Patterson and Mr. Tyrone Brown, with who she had relationships with, and by whom she was convinced by and committed these offenses for by providing false statements during the purchase of the firearms, at their request, and other than an arrest for driving while under the influence (which remains pending in the Superior Court New Britain, GA 15) she lived a law-abiding life. She also maintained full time employment at various companies.

The task for the Court now is how to sentence Ms. Boucher in light of statutory factors and goals of sentencing, 18 U.S.C. §3553(a), while also taking into account Ms. Boucher's rehabilitation to date, the fact that this is her first criminal sentence, and the reality that her conduct seems to be aberrant and inextricably linked to a period of personal turmoil which

included the breakup of a toxic marriage and a life-threatening medical event of her mother, with whom she was very close. For several reasons, we respectfully submit that a sentence well below the 12-18 months called for by the Guidelines, but somewhat less than that agreed to in the Plea Agreement, would adequately punish the offense conduct here and fully account for the various mitigating factors that are present in Ms. Boucher's case.

First, although Ms. Boucher's offense is admittedly serious, Ms. Boucher's history and characteristics do not suggest that she is the sort of violent or uniquely dangerous offender for whom a lengthy prison sentence is warranted in order to protect the public. Ms. Boucher is not a violent person and there is no allegation that she engaged in any acts of violence as part of the offense. Moreover, the persons who coordinated the firearms-related activities, was not Ms. Boucher but the two other individuals who used her ability to obtain firearms due to their inability to do so directly due to their prior criminal, felony history. Second, unlike the other two individuals, Ms. Boucher is a first time offender who has never served time in jail prior to her pretrial detention in this case. This lack of criminal history permits the Court to consider the need for incremental punishment as a basis for a variance. *See, e.g., United States v. Fathalla,* No. 07-CR-87, 2008 WL 4501057, at *4 (E.D. Wis. Sept. 29, 2009) ("Unlike some who qualify for the safety valve, this defendant was a true first-time offender, not just someone with 1 criminal history point or less." And "[s]tatistically, the rate of recidivism for such defendant's is quite low." Third, a sentence that recognizes rehabilitation over punishment is appropriate in light of Ms. Boucher's voluntary engagement in substance abuse treatment while incarcerated at Wyatt Detention Facility and lack of any disciplinary conduct. Furthermore, while detained, she has done a great deal of soul searching, recognizes that her failure to abide by her pre-detention

restrictions and conditions was unacceptable, she is not a danger to the public and she is amenable to court supervision in lieu of incarceration.

For all these reasons, Ms. Boucher respectfully request that the Court vary downward from the advisory range of 12 -18 months and also take into the account the terms of the Plea Agreement as entered into by the parties dated April 29, 2022, as well as the Court's consideration of a downward departure under U.S. v Fernandez, 877 f. 2d 1138 (2d Cir. 1989), and instead impose a non-Guideline sentence of time served followed by supervised release, including a period of home detention in lieu of further incarceration. Ms. Boucher asks that a fine be waived, unless she is given a non-custodial sentence, in which case she asks that the fine be imposed consistent with her ability to pay. Furthermore, she is willing to perform community service as may be deemed necessary and appropriate by the court.

## ARGUMENT

A sentencing court is obligated to fashion a sentence that is "sufficient, but not greater than necessary" to accomplish the goals of sentencing under 18 U.S.C. §3553(a). as a procedural matter, "[a] District Court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Dorvee,* 616 F. 3d 174, 180 (2d Cir. 2010) (quoting Gall v. United States, 552 U.S. 38, 49 (2007); *see also Rita v. United States,* 551 U.S. 338, 351 (2007). Next, the Court must determine whether or not to apply any of the Guidelines' departure policy statements to adjust a Guideline range. *See generally* U.S.S.G. § 1B1.1(a)-(c)*.* "[A]fter giving both parties and opportunity to argue for whatever sentence they deem appropriate, the District Judge should then consider all of the §3553(a) factors to determine whether they support the sentence requested by a party," including whether a non-Guidelines sentence is warranted. *See Gall,* 552 U.S. at 49-50; *see also Dorvee,* 616 F.3d at 174. "In so

doing, [the district judge] may not presume that the Guidelines range is reasonable," but instead he should "make an individualized assessment based on the facts presented." *Gall,* 552 U.S. at 50. "After announcing the sentence, the judge 'must adequately explain the chosen sentence to allow for meaningful appellate review.'" *Dorvee,* 616 F.3d at 174 (quoting *Gall,* 552 U.S. at 50); *see also Rita,* 551 U.S. at 356-57 ("when a judge decides simply to apply the Guidelines to a particular case, doing so will not necessarily require lengthy explanation").

A sentence that is "sufficient, but not greater than necessary" under U.S.C. 18 §3553(a) is the *lowest possible sentence* accounts for all of the relevant statutory factors. In other words, if a district court believes a lower sentence will be as effective as a higher sentence in light of the relevant factors, it must choose the lower sentence. *See United States v. Ministro-Tapia,* 470 F.3d 137, 142 (2d Cir. 2006) ("if a District Court were explicitly to conclude that two sentence is equally served the statutory purpose of §3553, it could not, consistent with the parsimony clause, impose the higher.").

## I.   CONSIDERATION OF THE SENTENCING FACTORS UNDER 18 U.S.C. §3553(a) SUPPORTS A SENTENCE BELOW GUIDELINE RANGE

In determining what sentence will best achieve the statutory purposes of sentence Ng, the Court must consider the following factors:

1. The nature and circumstances of the offense and the history and characteristics of the defendant;
2. The kinds of sentences available and the applicable sentence under the Sentencing Guidelines;
3. Pertinent policy statements issued by the Sentencing Commission;
4. The need to avoid unwarranted sentence disparities among similar defendants guilty of similar conduct; and
5. The need to provide restitution to any victims.

18 U.S.C. §3553(a)(1), (a)(3)-(a)(7).

When considering each of the statutory factors under §3553(a), the U.S. Supreme Court has made it clear that the sentencing process should focus carefully on the individual, and not merely on the crime itself. "It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue. Underlying this tradition is the principle that the punishment should fit the offender and not merely the crime." *Pepper v. United States,* 562 U.S. 476, 487-88 (2011) (Internal citations and quotations omitted); *see also Pennsylvania ex rel. Sullivan v. Ashe,* 302 U.S. 51, 55 (1937) ("For the determination of sentences, justice generally requires consideration of more than the particular acts by which the crime was committed and that there be taken into account the circumstances of the offense together with the character and propensities of the offender").

### A.  MS. BOUCHER'S PERSONAL HISTORY AND CHARACTERISTICS SUPPORT A TIME-SERVED SENTENCE FOR HER FIRST CONVICTION

Ms. Boucher has spent her entire life in and around the New Britain-Bristol areas. Most of her youth was spent in Bristol in close proximity to her grandparents. She was raised by both of her parents who now reside in Maine and for the most part, she has had a close relationship with her brother, TJ Boucher, which unfortunately now has become slightly estranged due to him having a hard time balancing his personal life, caring for their parents, which Ms. Boucher used to do pre-detention, and which he is now required to assist in areas he was originally not involved in. See PSR ¶ 61. He has also assumed temporary care of her dog, Bean, until her release.

Ms. Boucher has a documented history of employment and also has a high school diploma and as can be seen, from the attached character reference letters from former coworker, Robin

Smith, and her high school friend, Erica Gonzalez, her conduct was completely out of character. As indicated by Ms. Gonzalez, "The Leah that I know would give you the shirt off her back even if it was the last thing she had."

Ms. Boucher believes that the sudden, almost fatal stroke of her mother was a turning point in her life. She believes that it was the moment that everything went downhill. However, she felt that she had to prioritize taking care of her mother over her own priorities and needs. The events that followed, coupled with her failed marriage, and associating with the wrong people, who is she now understands were manipulating and using her, that she agreed to participate in the conduct that now brings her before the Court.

Ms. Boucher did participate in mental health counseling with a licensed psychiatrist, Dr. Perry Grithen, and a clinician at Column Health in Torrington for anxiety and depression, for quite some time prior to her current detention. She was prescribed medications for treating her mental health conditions. She currently remains on the same medications. See PSR ¶ 70 and 75.

Ms. Boucher Clearly and unequivocally regrets her involvement in the instant offense, and she wants to move past it. She has made good progress over the past five months, and she hopes that the Court will take that into consideration to continue on that path with a sentence that is not greater than necessary.

### B.  NATURE AND CIRCUMSTANCES OF THE OFFENSE

Although providing false statements during the purchase of a firearm is a serious offense, which Ms. Boucher clearly understands now, can contribute to violence, she is not a violent person herself. Moreover, in terms of the conduct at issue, it is undisputed that the persons who coordinated convincing Ms. Boucher's activities were not Ms. Boucher, but the two individuals

with felony records, knowing that they were prohibited from possessing firearms. Ms. Boucher's decision to participate in this activity, was not only ill-advised to say the least, but was influenced by her relationships with the two individuals. It was also completely out of character for her.

### C.  CONSIDERATION OF THE SENTENCING GUIDELINES AND AVAILABLE VARIANCES

In considering the Guidelines, the Court's task we'll be to decide whether a sentence within the advisory range is warranted, or, if it is not, to explain why a different sentence also satisfies all of the statutory factors under 18 U.S.C. §3553(a). " In so doing, [the Court] may not presume that the Guidelines range is reasonable," but instead it should "make an individualized assessment based on the facts presented." *Gall,* 552 U.S. at 50.

### I.  LACK OF CRIMINAL HISTORY AND STATUS OF FIRST OFFENDER

Ms. Boucher is 30 years old; She has no prior convictions; and she has never served time in jail prior to her pretrial detention in this case. this lack of contact with the justice system allows the Court to consider the need for incremental punishment as a basis for a variance. See PSR ¶ 50 and 53.

A downward variance based on her first offender status is supported by case law. Courts have recognized that the Guidelines, in their current form, failed to properly credit a person's lack of criminal history. *See e.g., United States v. Ward,* 814 F. Supp. 23, 24 (E.D. Va. 1993) (Granting departure based on defendants age as first time offenders since guidelines do not "account for the length of time a particular defendant refrains from criminal conduct" before committing his first offense); *United States v. Fathalla,* No. 07-CR-87, 2008 WL 4501057, at *4 (E.D. Wis. Sept. 29, 2008) ("Unlike Some who qualify for the safety valve, this defendant was a true first time

offender, not just someone with 1 criminal history point or less," and "[s]tatistcally, The rate of recidivism for such defendants is quite low."); *United States v. Germosen,* 473 F.Supp.2d 221, 227 (D.Mass. 2007) (citing studies and noting that "[m]inimal Or no prior involvement with the criminal justice system is a powerful predictor of a reduced likelihood of recidivism").

The Sentencing Commission has also recognized that the Guidelines fail to adequately account for true "first offender" status, given that there are other offenders who are in Criminal History Category I even though they have a prior arrest or conviction. For instance, The study showed that defendants who had one criminal history point were almost twice as likely to reoffend as those with no criminal history points, even though both sets of defendants would fall within Criminal History Category I. *See* United States Sentencing Comm'n, *Recidivism and the "First Offender"* (May 2004) at 13. [1]

### A. MENTAL HEALTH AND THE ABERRANT NATURE OF THE CONDUCT

" While a downward departure is based on a specific guideline provision, a downward variance is based simply on the district courts discretionary authority to consider 'the nature and circumstances of the offense and the history and characteristics of the defendant' in selecting 'a sentence sufficient, but not greater than necessary,' to comply with all the purposes of sentencing. 18 U.S.C. § 3553(a)." *United States v. DeRusse,* 859 F.3d 1232, 1237 (10th Cir. 2017). Thus, even if a defendant cannot satisfy the requirements for a downward departure for aberrant behavior, a district courts discretionary consideration of the aberrant nature of a

---

[1] The report revealed a significant difference in recidivism rates among Category I offenders with no criminal history points. Offenders with no prior arrests had a recidivism rate of 6.8%, whereas offenders with prior arrests but no prior convictions had a recidivism rate of 17.2%. Id. at 16-17. The study therefore concluded:

    From both culpability and recidivism risk perspectives, ... Offenders[] with no prior arrests, most strongly meet the conceptual definition of the first offender category. [These] [o]ffenders have had no recorded contact with the criminal justice system prior to their instant federal offense. Moreover, as indicated by their extremely low recidivism rate of 6.8%, they are easily the most empirically identifiable group of guideline federal offenders who are the least likely to reoffend.

defendant's conduct, "for purposes of a downward variance," may "focus on the extent to which the criminal conduct was out of character for him, rather than on the factors that would be applicable for a Section 5K2.20 departure." *Id.* (upholding 70-day time served sentence for kidnapping after giving a substantial weight to the defendants mental illness and the aberrant nature of conduct); *see also United States v. Nesbeth,* 188 F. Supp. 3d 179, 193-94 (E.D.N.Y. 2016) ("even if, *arguendo*, Ms. Nesbeth would not have qualified for an aberrant behavior departure under the strictures of guideline §5K2.20, she certainly qualifies for a significant post-*Booker* variance").

Ms. Boucher's conduct during this brief period stands in stark contrast to the rest of her life. She has otherwise led a law abiding life. She is also in need of supervision and mental health counseling to process her mother's sudden and unexpected incapacity, and what has led her to the underlying circumstances that brought her to this point, but a lengthy jail sentence is not needed in light of her personal background and minimal criminal history. In other words, a close analysis of Ms. Boucher's history and characteristics, §3553(a)(1), suggests that a downward variance to account for the apparent nature of her conduct is appropriate.

## B. POST-OFFENSE REHABILITATION

The Second Circuit has recognized that a sentencing court may consider any pre-sentence rehabilitation that a defendant has demonstrated, as well as the likelihood that probation rather than prison will facilitate a defendant's future rehabilitation. *See United States v. Maier,* 975 F.2d 944, 948 (2d Cir. 1992) ("uneven" rehabilitation efforts still merited downward departure from a range of 51 to 63 months to a sentence defendant to four years probation with a condition that the defendant participate in a community drug treatment program); *United States v. K,* 160 F. Supp.2d 421, 442 (E.D.N.Y. 2001); *Nesbeth,* 188 F. Supp. 3d at 194.

Further, a defendants rehabilitation efforts may justify relief from the guidelines where they show "awareness of one's circumstances and the demonstrated willingness to act to achieve rehabilitation, thereby benefiting the individual and society." *Maier,* 975 F.2d at 948; *see United States v. Lieberman,* 971 F.2d 989, 996 (3d Cir. 1992) ("Lieberman's post-offense ameliorative conduct adequately justified the district court's decision to depart downward based on the unusual degree of Lieberman's acceptance of responsibility"). Set another way, relief is appropriate where the defendant has made "concrete gains toward 'turning his life around.'" *United States v. Sally,* 116 F.3d 76, 81 (3d Cir. 1997).

Ms. Boucher has begun the process of turning her life around. This rehabilitative process is by no means complete, but that should not diminish its significance in deciding whether anymore incarceration is necessary for Ms. Boucher.

### C.  KINDS OF SENTENCES AVAILABLE

Ms. Boucher is statutorily eligible for probation. If probation is imposed, the Court must include a fine, restitution, or community service unless extraordinary circumstances are present. Because Ms. Boucher is in a Zone C of the sentencing table, the minimum term may be satisfied by (1) a sentence of imprisonment; or (2) a sentence of imprisonment that includes a term of supervised release with a condition that substitutes community confinement or home detention according to the schedule in subsection ( e ) , provided that at least 1/2 of the minimum term is satisfied by imprisonment. U.S.S.G. §5C1.1 (d). See PSR ¶95.

Because Ms. Boucher was in pretrial custody after her arrest, for a period of five months and 18 days (February 23, 2022 to August 10, 2022), she is eligible for an incarceration disposition of time served in lieu of straight probation. If Ms. Boucher is sentence to time served, the court can impose a period of supervised release of up to three years period as noted in the plea

agreement, if she violates the terms of supervised release, she faces up to two years per violation under U.S.C. §3583, with no credit or time already spent on supervised release.

Contrary to popular perception, the non-custodial portion of the sentence is indeed "punishment" under our federal sentencing laws, and it should be actively considered by the Court when fashioning a sentence. In *Gall v. United States,* the U.S Supreme Court they rejected the notion that probation and other non-custodial sentences are not punishment under 18 U.S.C §3553(a):

> Offenders on probation are nonetheless subject to several conditions that substantially restrict their liberty… Inherent in the very nature of probation is that probationers do not enjoy the absolute liberty to which every citizen is entitled… Probationers may not leave the judicial district, move, or change jobs without notifying, and in some cases receiving permission from, bear probation officer or the court. They must report regularly to their probation officer, permit unannounced visits to their home, refrain from associating from any person convicted of a felony, and refrain from excessive drinking. Most probationers are also subject to individual "special conditions" imposed by the court.

*Gall,* 552 U.S. at 48-49; *see also* ABA Standards on Criminal Justice, Sentencing 18-6.4(a), p. 227 (3rd ed. 1994) ("A sentencing court should prefer sanctions not involving total confinement in the absence of affirmative reasons to the contrary.").

Finally, a sentence that involves supervision and alternatives to imprisonment is consistent with "the general appropriateness of imposing a sentence other than imprisonment" where, as here, the defendant has no criminal history and is convicted of a nonviolent offense. See 28 U.S.C. 928(j) (" The Commission shall ensure that the guidelines reflect the general

appropriateness of imposing a sentence other than imprisonment in cases which the defendant is

a first offender who has not been convicted of a crime of violence or in otherwise serious

offense, and the general appropriateness of imposing a term of imprisonment on a person

convicted of a crime of violence that results in serious bodily injury.").

### D.  THE NEED TO AVOID UNWARRANTED DISPARITIES

Pursuant to § 3553(a)(6), a sentencing court must also take into account "the need to avoid

unwarranted sentencing disparities among defendants with similar records who have been found

guilty of similar conduct," and this extends to defendant sentenced within the same case. *See*

*Gall,* 128 S. Ct. at 600; see also *United States v. Wills,* 476 F.3d 103, 109 (2d Cir. 2007) ("the

plain language of §3553(a)(6) does not on its face restrict the kinds of disparity a court may

consider"); *United States v. Fernandez,* 443 F.3d 19, 31 n. 9 (2d Cir. 2006) (same). whether any

difference among sentence is warranted or unwarranted depends on the individual circumstances

of each case and their relationship to the purposes of sentencing. "Unwarranted disparity is

defined as different treatment of individual offenders who are similar in relevant ways, or similar

treatment of individual offenders who differ in characteristics that are relevant to the purposes of

sentencing." U.S. Sent. Comm'n, *Fifteen Years of Guidelines Sentencing: An Assessment of How*

*Well the Federal Criminal Justice System is Achieving the Goals of Sentencing Reform,* at 113

(2004).[2] thus, while this factor calls for equal treatment for similarly situated offenders, "it is

worth noting that equal treatment consists not only of treating like things like, but also of treating

unlike things differently according to their differences." *United States v. Irey,* 612 F.3d 1160,

1205 (11th Cir. 2010) (en banc).

---

[2] Available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-projects-and-surveys/miscellaneous/15-year-study/15_year_study_full.pdf (last accessed Aug. 1, 2020).

The fact that the Guidelines call for sentence of 12 to 18 months suggests that a time-served disposition in this matter would contribute to sentencing disparities. The Court's primary aim, however, is to avoid **unwarranted** disparities. In this case, there are reasons to treat Ms. Boucher differently than other offenders nationally.

Looking beyond this case, a search of the sentencing database maintained by the U.S Sentencing Commission indicates that, of the 46 defendants in Criminal History Category I who were sentenced under U.S.S.G. §2K2.1 in the Second Circuit in Fiscal Year 2021, the average sentence was 15 months, and the median sentence was eight months.[3] it is not known how many of these offenders were true "first offenders"; nor is it known whether the offenses in those cases involved multiple firearms or a single firearm. Ms. Boucher's requested sentence is obviously much lower than the average, but we respectfully submit that her lack of any prior convictions, the aberrant nature of the conduct, her post-offense rehabilitation, and the absence of any aggravating factors in her personal background make her sentencing request a reasonable one.

## II.     THE GOALS OF SENTENCING SUPPORT A NON-GUIDELINES SENTENCE

The sentence to be imposed on Ms. Boucher must comply with "the four identified purposes of sentencing: just punishment, deterrence, protection of the public, and rehabilitation." *Dean v. United States,* 137 S. Ct. 1170, 1175 (2017); *see also Gall,* 552 U.S. at 50, n. 6;18 U.S.C. §3553(a)(2)(A)-(C). the sentencing statute also mandates consideration of the need "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." 18 U.S.C. §3553(a)2(D).

---

[3] See U.S Sentencing Commission, Data Analyzer, available at https://ida.ussc.gov/analytics/saw.dll?Dashboard.

### A.  JUST PUNISHMENT

The concept of "just punishment" under §3553(a)(2)(A) refers to the need for a defendant punishment to fit the crime. In the Senate Report accompanying the Sentencing Reform Act the Act's sponsors explained:

[Just punishment] -- essentially the "just deserts" concept- should be reflected clearly in all sentences; it is another way of saying that the sentence should reflect the gravity of the defendants conduct. From the public standpoint, the sentence should be of a type and length that will adequately reflect, among other things, the harm done or threatened by the offense, and the public interest in preventing recurrence of the offense period from the defendant standpoint the sentence should not be unreasonably harsh under all the circumstances of the case and should not differ substantially from the sentence given to another similarly situated defendant convicted of a similar offense under similar circumstances.

S. Rep. 98-225, 1984 U.S.C.C.A.N. 382, 325-59.

### B. DETTERANCE

Section 3553(a)(2)(B) instructs the Court to consider whether the sentence provides adequate deterrence to criminal conduct. This concept embodies two related concepts: general deterrence (deterring the public from crime) and specific deterrence (deterring the defendant from future criminal behavior).

The National Institute of justice- the research, development, and evaluation agency of U.S  Department of Justice- has noted the following about deterrence theory:

1. "The certainty of being caught is a vastly more powerful determinant than the punishment."

2. "Sending an offender to prison isn't a very effective way to deter crime."

3. "Police deter crime by increasing the perception that criminals will be caught and punished."

4. "Increasing The severity of punishment does little to deter crime."[4]

Applying this research, general deterrence is accomplished in this case, first and foremost, by the fact of Ms. Boucher's prosecution. That alone is significant. In terms of specific deterrence, a felony conviction and a time-served or probationary sentence would be sufficient to deter Ms. Boucher. She is receiving her first criminal sentence of any kind, and the consequences for her to this point have already been severe from her perspective. She was detained in prison for the first time in her life. A sentence of court supervision, whether as part of supervised release term or probationary sentence, will be regarded by Ms. Boucher as significant and just as important, proportional to her conduct and personal circumstances.

## C.  PROTECTION OF THE PUBLIC

Pursuant to 18 U.S.C. § 3553(a)(2)(C), the Court We must consider whether a particular sentence is needed " to protect the public from further crimes of the defendant." Given Ms. Boucher's lack of any criminal history, and the aberrational nature of the conduct, this goal of sentencing does not suggest that a prison sentence is needed to protect the public from Ms. Boucher. A supervision-based sentence that monitors her in the community would suffice.

---

[4] *See* NIJ, "Five Things About Deterrence (citing Daniel Nagin, "Deterrence in the 21st Century," in *Crime and Justice in America 1975-2025* (ed. Michael Tonry, Univ. Chicago Press, 2013) available at https://www.ncjrs.gov/pdffiles1/nij/247350.pdf. The fifth finding about deterrence- that "[t]here is no proof that the death penalty deters criminals"- is not applicable here.

### D.  REHABILITATION

Pursuant to 18 U.S.C. §3553(a)(2)(D), Courts also must consider the need "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." In fulfilling this objective, it is widely acknowledged that imprisonment is not to be used as a vehicle by which to achieve rehabilitation. *See Tapia v. United States,* 564 U.S. 319, 330 (2011) (lengthening sentence to "promote rehabilitation" violates §3582(a)); *id.* ("Do Not think about prison as a way to rehabilitate and offender.") *United States v. Anderson,* 15 F.3d 278, (2d Cir. 1994) (discussing 18 U.S.C. §3582(a) and 28 U.S.C. §994(k)). In other words, while incarceration facilitates specific deterrence, incarceration can also be detrimental to the rehabilitation process:

> Imprisonment… excludes offenders from economic and political participation, and loosens prisoners relationships with families and communities. While prison may not necessarily function as a 'crime school', it destroys many of the connections and offender ultimately needs to regain his place in society.

Nora v. Demleitner, "Smart Public Policy: Replacing Imprisonment with Targeted Nonprison Sentences and Collateral Sanctions," in *A More Perfect System: Twenty Five Years of Guiidlines Sentencing Reform,* 58 Stanford L.R. 1, 345 (2005) (citations omitted).

This is a significant factor in Ms. Boucher's sentencing. She has a history of opioid and crack cocaine abuse for which she may need ongoing counseling and treatment. In addition, she has a diagnosis of depression and anxiety disorders. A sentence that provides her with support through drug treatment, mental health counseling, would be a more effective sentence then prison. If the Court Is considering more prison time, it should consider maximizing the period of

supervision, or adding a special condition of home detention in lieu of any additional period of incarceration.

## **CONCLUSION**

For All these reasons, Ms. Boucher respectfully request that the Court very downward from the advisory range of 12 -18 months, and instead impose a non-Guidelines sentence of time served, followed by supervised release with conditions, including a period of home detention in lieu of further incarceration.

The sentence should also include conditions requiring Ms. Boucher to participate in substance abuse and mental health counseling. Ms. Boucher Asks that are fine be waived, unless she is given a non-custodial sentence, in which case she asked that the fine be imposed consistent with her ability to pay.

Respectfully Submitted,

*/s/ Brian J. Woolf* ct 10227
Brian J. Woolf, Esq.
Woolf Law Firm, LLC
50 Founders Plaza,
East Hartford, CT 06108
Phone: 860-290-8690
Fax: 860-290-8697
Email: w@woolflaw.com

## **CERTIFICATION**

I hereby certify that on this date a copy of the foregoing pleading was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's Electronic Filing system and by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF system.

Dated at East Hartford, Connecticut on this 26th July, 2022.

/s/ Brian J, Woolf, Esq.

Brian J. Woolf, Esq.

Robin M Smith
250 Summer Street, Unit 1
Plantsville  CT  06479
860-978-2630

The Honorable Janet B. Arterton
U.S. District Court House
141 Church Street
New Haven  CT  06510

RE: USA v. Leah Boucher
     Docket No: 3:22-cr-00088-JBA

Dear Judge Arterton,

I am writing this letter on behalf of Ms. Leah Boucher.  I was made aware that she is facing criminal
charges in your Court & is awaiting sentencing.  This conduct is so out of character from the Leah I know,
trust & care about.

I met Leah in 2015 when I started working at Arbor Benefit Group with her.  Leah was the Exec Assistant
to one of the partners.  I worked along side of her as an executive assistant/bookkeeper.  Leah is a hard
worker, and would do whatever tasks she was assigned, working late, and on weekends for the partner.

When I first met Leah, she was living at home with her parents.  Leah was doing well, getting on her
feet, working full time, and helping her then boyfriend Matt to get a job & get on his feet.  Matt's
mother abandoned him when he was a teenager and Matt lived in his car for a while, then he met Leah
& they started dating.  Matt would stay at Leah's parents with her until they could afford an
apartment.  Once they got an apartment, things were going good for Leah & Matt.  They were both
working full time, they both had good cars & were even able to save some money.  Leah & Matt married
in 2019, but Leah wasn't happy.  It turned more into a brother/sister relationship and Leah did file for
divorce the following year, which Matt was not very happy about.  I was one of the few people Leah had
in her life at the time that could help her, by being supportive, encouraging & someone for her to talk
to.

Late in 2016 I believe it was, Leah's mother was diagnosed with a tumor on her brain stem (?) & needed
to have surgery to remove it.  The surgery wasn't as simple as the doctor had thought.  Her mother was
in surgery for over 12 hours & is now permanently disabled.  Everything fell into Leah's lap!  Leah took
care of her father, brother, the parents house, their bills, the mothers care, dr appt's, etc. in addition to
the apartment she & her Matt shared.  Leah would work 8-9 hours a day at Arbor Benefit Group, then go
to her parents to make them dinner, clean up, help her mother, whatever needed to be done.  Her
mother was not in a good place, crying all the time, no one loved her, didn't want her, she was no good
anymore, couldn't do much for herself at all.  Understandably, it was upsetting for Leah as Leah & her
mom were very close, enjoyed each other's company, would talk daily, spend time together out with
others.   At times I didn't know how Leah did it.

Leah & I would talk at work, and more than once Leah would break down & cry, I would do what I could
to console her, sometimes just hold her while she cried, I would send her cheerful messages, try to help

her by letting her talk about what she was going through, and offer encouragement.   During Covid, we weren't able see each other as much as all employees were working at home, except myself, I still worked in the office due to my responsibilities.  Leah & I would still talk regularly.

Leah is a very caring person, and wants to please others.   No matter what was asked of her at work, Leah would do it.  Sometimes I would tell her she shouldn't need to be treated the way she was, but she didn't want to rock the boat and be terminated.  At one time Leah was a happy person, but after the events with her mother, she was slowly getting overwhelmed.  Leah did seek counseling at one point, but that was difficult for her as with all the responsibilities placed on her.

I believe what Leah did was not out of maliciousness but to help someone she thought to be a friend.  I don't know, but I feel that Leah was coerced into doing what she did.  I do ask the court to give Leah a chance to prove herself that she is sincere in her remorse for her conduct which she has pled guilty to.

I hope I am allowed to be in court for the sentencing to show Leah I'm still here for her, and I do care.  I know Leah is a better person, that she just got involved with & placed her trust in some bad people who didn't care about Leah.  Leah was a means to an end for someone.

Thank you for the opportunity to give a small glimpse to the Leah Boucher I know, and care about.

Sincerely,


Robin M. Smith
250 Summer St, Unit 1
Plantsville  CT  06479
860.978.2630

Character Reference Letter


Name Erica Gonzalez
Address 152 Bissell Street Manchester CT 06040
Telephone No. (860) 477-7195


The Honorable Janet B. Arterton
U.S. District Court House
141 Church Street
New Haven, Connecticut 06510

Re: USA v. Leah Boucher
    Docket No.: 3:22-cr-00088-JBA

Dear Judge Arterton,
I am writing this letter on behalf of Ms Leah Boucher. I am aware that she is facing criminal charges in your court and is awaiting sentencing. I have known Leah since I was in High School and she has been one of my best friends since then. Leah is also my oldest daughter's god mother. The Leah that I know would give you the shirt off of her back even if it was the last thing she had. She is my diary in so many ways and has stood by my side in the darkest of my times. My children refer to her as Auntie Leah and no matter what she was always there for my children from little thing here and there to a babysitter when I had no one to work. I have seen Leah in all walks of life from our wild typical teen years to her settling into her first apartment and getting her first dog. Leah enjoyed a laidback life in the woods. Spending a lot of time in her family's home in Maine. When I first learned of Leahs charges I was very surprised because I knew how important it was to Leah even back to the day she got it to have her gun permit. I could not believe my quiet small town best friend had gotten herself into something like this. I do still keep in contact with Leah and can see that she knows what she did is wrong and has learned her lesson. I'm not sure who the person who committed these crimes is but I know through the 15 years of knowing her that was not my best friend. Please give her a chance to prove to the court that she is sincere in her remorse for the conduct for which she has pled guilty to.


Erica Gonzalez  07/07/2022

Matthew Neault

733 Jerome Ave, Bristol, CT

1-(929)-216-1596


                    The Honorable Janet B Arterton

                    US District Court House

                    141 Church St, New Haven, CT 06510

Re: USA v Leah Boucher

Docket # 3:22-cr-00088-JBA


"Dear, Judge Arterton, I Am writing this Letter on Behalf of Leah Boucher I Am Aware that she is facing criminal charges In your court And Is Awaiting Her sentencing. I was married to Leah for only year and a Half But we Lived and Dated for ten years Before marriage met Her when she was only 19 yes old, I Am five years older Then Her she was manager of motor clothes Department At Harvey shop we Both worked at what Attracted me to Leah was How Mator [SIC] she was for Her Age, Always Helping others friends family, Takes care of our Dog Bean we shared which Im sure They Both miss each other, But me Leah Have Been threw And Helped one Another Threw Alot, From 2019 on Alot  Happend my mom passed cancer, Her mom was sick parents moving when I found out what Happen was out of charareter for Her To Do what she Did, she couldnt Have Been In Right mind set pretty sure she Learned Her Lesson Just form the Time she Been In there, Not Having or Being with Bean our Dog sure killing Her Inside, Think probation And second chance given I Think she will Do Right thing this time P.S sorry BaD spelling " [sic]


/s/ Matthew Neault        7/19/22

Matthew, Neault
733 Jecome, Ave Bristol, CT
1-(929)-216-1596

The Honorable JANET B ARTERTON
US District Court House
141 Church, St. New Haven, CT 06510

Re: USA v Leah Boucher
Docket #3:22-cr-00088-JBA

DEAR, Judge ARTERTON, I am writing this letter on behalf of Leah Boucher I am aware that she is facing criminal charges in your court and is awaiting her sentencing, I was married to Leah for only year and a half but we lived and dated for ten years before marriage Met her when she was only 19 yrs old, I am five years older Then her she was manager of motor clothes department at Harley shop we both worked at what attracted me to Leah was how mature she was for her age, Always helping others friends family, takes care of our dog Bean we shared which I'm sure They both miss each other, BUT me Leah have been threw and helped one another threw alot, from 2019 on alot happen my mom passed cancer, Her mom was sick parents moving when I found out what happen was out of character for her to do, what she did, she couldn't have been In right mind set pretty sure she learned her lesson Just from the time she been in there, Not having or being with Bean our dog sure killing her inside, Think probation and second chance given I think she will do right thing this time P.S sorry bad spelling

~~Matthew~~                    7/19/22